**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

VR GLOBAL PARTNERS, L.P.,

                            Plaintiff,

   -against-

PETRÓLEOS DE VENEZUELA, S.A., PDVSA PETRÓLEO, S.A., AND PDV HOLDING, INC.,

                         Defendants.

23 Civ. _____

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

        Plaintiff VR Global Partners, L.P. ("VR Capital" or "Plaintiff") brings this action against Defendants Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A. ("PDVSA Petróleo") and PDV Holding, Inc. ("PDVH," and, collectively with PDVSA and PDVSA Petróleo, the "Defendants" or the "PDVSA Parties") and allege as follows:

**SUMMARY OF THE ACTION**

        1.     This is a civil action for common law fraud, violations of Section 17(a) of the Securities Act, violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and aiding and abetting arising from material false representations and/or omissions made by Defendants, and Defendants' development of a fraudulent scheme in connection with senior secured notes (the "2020 Notes") that PDVSA issued in connection with an exchange offer in 2016 (the "Exchange Offer").

        2.     The terms of the Exchange Offer and the terms of the 2020 Notes are described in an offering circular dated September 26, 2016, and a supplement to such offering circular dated

September 26, 2016 (together, the "Offering Circular").[1]  The Exchange Offer was structured as a tender offer, allowing holders of earlier-dated notes set to mature in 2017 (the "2017 Notes") to elect to tender their 2017 Notes for the 2020 Notes, which bore an interest rate higher than that of the 2017 Notes.  The 2020 Notes, by their terms, were due to reach original maturity on October 27, 2020.  The 2020 Notes are governed by an Indenture[2] and the terms set forth on the face of the 2020 Notes.  The 2020 Notes and the Indenture contained choice-of-law clauses providing that these documents would be governed by New York law.

3.      PDVSA's subsidiary PDVSA Petróleo guaranteed the 2020 Notes.

4.      The 2020 Notes were secured pursuant to a Pledge Agreement[3] by a pledge by PDV Holding, Inc. ("PDVH") of 50.1% of the capital stock of Citgo Holding, Inc. ("Citgo Holding"). Citgo Holding, in turn, owns 100% of the capital stock of Citgo Petroleum Corporation ("Citgo").

5.      Leading up to and at the time of the Exchange Offer, Defendants represented to investors that the 2020 Notes were valid, legal, and enforceable, and that Defendants had the capacity to enter into the 2020 Notes, the Indenture, and the Pledge Agreement.  Defendants continued to ratify noteholders' belief in the validity of the 2020 Notes by continuing to make required payments of principal and interest on the 2020 Notes through April 2019, and by declaring publicly that PDVSA would honor its obligations under the 2020 Notes.

---

[1] The Offering Circular is attached to the Complaint as Exhibit 1.

[2] The Indenture was executed as of October 27, 2016, between PDVSA; PDVSA Petróleo, as Guarantor; the Trustee; the Collateral Agent; Law Debenture Trust Company of New York as Registrar, Transfer Agent, and Principal Paying Agent; and Banque Internationale à Luxembourg, Société Anonyme, as Luxembourg Paying Agent. The Indenture is attached to this Complaint as Exhibit 2.

[3] The Pledge Agreement means the Pledge and Security Agreement dated October 28, 2019, between PDVH as pledgor, PDVSA as issuer, PDVSA Petróleo as guarantor, the Collateral Agent, and the Trustee.  The Pledge Agreement is attached to the Complaint as Exhibit 3.

6.      While Defendants' conduct and public statements led noteholders to believe that the 2020 Notes were valid, legal, and enforceable, Defendants privately held the belief that the 2020 Notes were invalid pursuant to the Venezuelan Constitution due to lack of approval by the National Assembly, Venezuela's unicameral legislature.

7.      On October 15, 2019, the National Assembly passed a non-binding resolution declaring for the very first time that the 2020 Notes were invalid under the Venezuelan Constitution.  Two weeks later, on October 28, 2019, PDVSA defaulted on the 2020 Notes by failing to make required payments of principal and interest due on the 2020 Notes.  The very next day, the PDVSA Parties commenced an action in the Southern District of New York (the "Declaratory Judgment Action") against MUFG Union Bank, N.A., Trustee under the Indenture (the "Trustee"), and GLAS Americas LLC, the Collateral Agent under the Indenture (the "Collateral Agent").  Plaintiff was not a party to the Declaratory Judgment Action.

8.      In the Declaratory Judgment Action, the PDVSA Parties sought a judgement declaring the 2020 Notes invalid, illegal, null and void *ab initio*-—despite the PDVSA Parties' representations in connection with and following the Exchange Offer that the 2020 Notes were valid and enforceable—because the 2020 Notes were issued without the authorization of Venezuela's National Assembly.  The theory behind this claim was that National Assembly approval is required in order to bind the Republic to "contracts of national interest" under the Venezuelan Constitution, a specific type of contract that generally involves the Republic as a party.

9.      The Trustee and Collateral Agent asserted counterclaims against the PDVSA Parties for breach of contract, declaratory judgment, unjust enrichment, and *quantum meruit*, arguing that (i) the 2020 Notes are governed by New York law, and therefore the Venezuelan Constitution and the concept of "contracts of national interest" requiring National Assembly

approval do not apply, and (ii) even if the contracts were in any way governed by Venezuelan law, the 2020 Notes are not "contracts of national interest" such that they would ever require National Assembly approval.

10.     In June 2020, the parties moved for summary judgment on a subset of these claims, and on October 16, 2020, the Court issued an Opinion and Order granting the Trustee and Collateral Agent's motion for summary judgment on the grounds that New York law applied to the 2020 Notes, and under New York law, the 2020 Notes were valid and enforceable.  The Court did not rule on issues of Venezuelan law.

11.     The Order was appealed to the Second Circuit, and the case remains on appeal.  On October 13, 2022, the Second Circuit certified questions of law to the New York Court of Appeals.

12.     Prior to the Declaratory Judgment Action, and as it was ongoing, the PDVSA Parties were engaged in an ongoing scheme to prevent the transfer of the collateral underlying the 2020 Notes.  The PDVSA Parties engaged in discussions with the U.S. Treasury Department and the Office of Foreign Assets Control ("OFAC") to delay noteholders' authorization to foreclose on the collateral underlying the 2020 Notes.  When OFAC issued revised guidance that expressly permitted transfer of this collateral on April 7, 2023, the PDVSA Parties advanced frivolous legal arguments in an effort to prevent noteholders from benefitting from the Exchange Offer.

13.     By asserting that the 2020 Notes are invalid and unenforceable in the Declaratory Judgment Action and asserting frivolous legal arguments in recent public filings, the PDVSA Parties laid bare their ongoing fraudulent scheme: to induce bondholders to tender their 2017 Notes in exchange for 2020 Notes and/or purchase 2020 Notes on the primary or secondary market, to receive the benefit of the Exchange Offer and/or payment for the 2020 Notes, to repudiate the 2020

Notes on grounds of Venezuelan constitutional law, and to seek to prohibit the transfer of collateral underlying the 2020 Notes.

14.     Plaintiff, a beneficial owner of the 2020 Notes, brings this action for damages resulting from Defendants' ongoing fraudulent scheme.

## PARTIES

15.     Plaintiff VR Capital is an investment fund with its principal place of business in New York, New York.  VR Capital owns $30,000,000 of the 2020 Notes.

16.     Defendant PDVSA is a Venezuelan corporation with its principal place of business in Caracas, Venezuela.  PDVSA is an oil and natural gas company that is wholly owned by the Bolivarian Republic of Venezuela.

17.     Defendant PDVSA Petróleo is a Venezuelan corporation with its principal place of business in Caracas, Venezuela.

18.     Defendant PDVH is a Delaware corporation with its principal place of business in Houston, Texas.

## JURISDICTION AND VENUE

19.     The Exchange Act claims asserted herein arise under and pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

20.     The Securities Act claims asserted herein arise under and pursuant to Section 17(a) of the Securities Act, 15 U.S.C. § 77q.

21.     This Court has subject matter jurisdiction over this action pursuant to Securities Act Section 22(a) (15 U.S.C. § 77v(a)) and Exchange Act Section 27 (15 U.S.C. § 78aa).

22.     This Court has personal jurisdiction over Defendants because they consented to the jurisdiction of this Court in the Indenture and the Pledge Agreement.

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district and because Defendants waived any objection to venue in this Court pursuant to the Indenture and Pledge Agreement.

24.     In connection with the acts, conduct and other wrongs alleged in the Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, United States mail, interstate telephone communications and the facilities of the national securities exchange.

## FACTUAL ALLEGATIONS

### A.     PDVSA AND ITS SUBSIDIARIES

22.     PDVSA is an oil and natural gas company established by the Venezuelan government to coordinate, monitor, and control all operations relating to the country's oil and natural gas reserves.  PDVSA was incorporated as a *sociedad anónima* in 1975 and is wholly owned by the Bolivarian Republic of Venezuela.

23.     PDVSA owns 100% of the shares of PDVSA Petróleo and PDVH.  PDVH, in turn, owns 100% of the shares of Citgo Holding, a Delaware corporation.  Citgo Holding owns 100% of the shares of Citgo.  PDVSA, PDVSA Petróleo and PDVH are all party to the debt documents governing the 2020 Notes.  Citgo is a Delaware corporation with headquarters in Houston, Texas.  Citgo's business includes the refining, transportation, and marketing of transportation fuels, lubricants, petrochemicals, and other products.

24.     PDVSA and PDVSA Petróleo, as *sociedades anónimas*, are managed by their boards of directors and corporate officers.  The Articles of Incorporation for PDVSA and PDVSA Petróleo allow their boards of directors, among other things and without any relevant limitations, to "authorize the execution of contracts."

**B.     THE 2017 NOTES**

25.     In April 2007, PDVSA issued $3 billion of Notes due in April 2017 with an interest rate of 5.25% (the "April 2017 Notes").  In October 2010 and January 2011, PDVSA issued an additional $6.15 billion of Senior Notes due in November 2017 with an interest rate of 8.5% (the "November 2017 Notes").  Together, the April 2017 Notes and November 2017 notes are referred to as the "2017 Notes."  PDVSA Petróleo was a guarantor of all the 2017 Notes.

26.     The 2017 Notes were denominated in U.S. dollars, governed by New York law, and administered by a trustee in New York.

27.     PDVSA did not obtain approval from Venezuela's National Assembly before issuing the 2017 Notes.  None of PDVSA, PDVSA Petróleo, or PDVH have ever disputed the validity of the 2017 Notes.

28.     After the issuance of the 2017 Notes, PDVSA's credit ratings declined substantially, which credit rating agencies attributed to the sustained decline in crude oil prices, among other factors.

**C.     THE POLITICAL SITUATION IN VENEZUELA IN 2016**

29.     Between 1999 and 2013, Hugo Chávez was the President of Venezuela.

30.     In 2013, following Chávez's death, Nicolás Maduro became the President of Venezuela.  Maduro won a special presidential election later that same year.

31.     From 2013 until January 2019, the United States recognized Maduro as the legitimate president of Venezuela and the Maduro administration as the country's legitimate government.

32.     In National Assembly elections held in December 2015, an opposition coalition won control of Venezuela's National Assembly, the country's unicameral legislature.

**D.     THE 2016 EXCHANGE OFFER**

33.     On September 16, 2016, PDVSA announced it would commence an Exchange Offer to refinance the 2017 Notes.  As described in the Offering Circular, PDVSA offered to exchange all of the remaining 2017 Notes for new 2020 Notes.  The Offering Circular, along with unexecuted drafts of the Indenture and the Pledge Agreement, was filed with the United States Securities and Exchange Commission ("SEC").

34.     At that time, the 2017 Notes had an aggregate principal amount outstanding of approximately $7.1 billion.  The conversion ratio that PDVSA initially proposed was 1:1, meaning that an exchanging holder would receive 2020 Notes with a principal amount equal to the principal amount of the 2017 Notes the holder exchanged.  The 2020 Notes would have an interest rate of 8.5%.  This was a higher interest rate than the subset of the 2017 Notes issued in 2007 (5.25%), but the same interest rate as the subset of the 2017 Notes issued in 2010 and 2011.

35.     The 2016 Exchange Offer was structured as a tender offer.  Each holder had until the tender offer deadline (initially, October 14, 2016) to elect to accept the exchange offer by "tendering" its 2017 Notes.  PDVSA was not obligated to close the exchange unless holders of at least 50% of the 2017 Notes (by principal amount) elected to participate.  In order to encourage holders to tender, PDVSA offered a 5% "premium" for holders who tendered by the early tender deadline (initially, September 29, 2016).  In other words, holders who tendered early would receive $1,050 of 2020 Notes for each $1,000 of 2017 Notes that they tendered.

36.     The 2020 Notes were secured by a pledge by PDVH of 50.1% of the capital stock of Citgo Holding.  The location of the collateral in the United States meant that it could reasonably be expected to be easier to foreclose upon in the event of a default than if it were located in Venezuela.

37.     On September 16, 2016, PDVSA announced that the exchange offer was approved by its board of directors at a meeting held on September 7, 2016; by PDVSA's Extraordinary General Shareholder Assembly at a meeting held on September 8, 2016; and by the board of directors of PDVSA Petróleo at a meeting held on September 7, 2016.  These announcements were published by various online publications and other means of interstate commerce.

38.     Following the announcement of the 2016 Exchange Offer, on September 27, 2016, the opposition-led National Assembly passed a resolution expressing disapproval of the pledge of the capital stock of Citgo Holding and the indirect interest in Citgo.  The resolution opined that PDVSA's need to offer the security interest to refinance the debt, despite Venezuela's having the "largest oil reserves in the world," was an "indicator of the credibility problems" PDVSA was facing.  While the National Assembly stated that it "[c]ategorically reject[ed]" the pledge, it did not assert that the transaction (including the Pledge Agreement) required the approval of the National Assembly under the Venezuelan Constitution or otherwise, and did not assert that the transaction was illegal, invalid, or unconstitutional.

39.     On September 26, 2016, PDVSA amended the terms of the exchange offer to: (i) increase the conversion ratio from 1:1 to 1:1.12 (for the April 2017 Notes) and from 1:1 to 1.17 (for the November 2017 Notes); (ii) establish a maximum exchange amount of 75% of the 2017 Notes; and (iii) extend the early tender deadline from September 29, 2016, to October 6, 2016.

40.     PDVSA continued to extend the deadlines.  On October 6, 2016, PDVSA again extended the early tender deadline to October 12, 2016.  On October 12, 2016, PDVSA extended both the early tender deadline and the expiration date to October 17, 2016—which had the effect of offering the early tender premium to all exchanging holders.  And on October 17, 2016, PDVSA further extended the deadlines to October 21, 2016.

41.     PDVSA ultimately waived the 50% tender threshold.  On October 24, 2016, PDVSA announced that holders with approximately $2.8 billion of 2017 Notes (approximately 39.43%) had tendered in exchange for approximately $3.4 billion of 2020 Notes.

42.     On October 27, 2016, the Indenture was executed among (i) PDVSA, as issuer, (ii) PDVSA Petróleo, as Guarantor, (iii) MUFG Union Bank, N.A., as Trustee, (iv) GLAS Americas LLC, as Collateral Agent, (v) Law Debenture Trust Company of New York, as Registrar, Transfer Agent, and Principal Paying Agent, and (vi) Banque Internationale à Luxembourg, Société Anonyme as Luxembourg Paying Agent.

43.     On October 28, 2016, the Pledge Agreement was executed among (i) PDVH, as Pledgor, (ii) PDVSA, as Issuer, (iii) PDVSA Petróleo, as Guarantor, (iv) GLAS Americas LLC, as Collateral Agent, and (v) MUFG Union Bank, N.A., as Trustee.

44.     On October 28, 2016, "Global Notes" were executed among PDSVA Director Ana María España, on behalf of PDVSA, as Issuer, and Fernando Moreyra, Vice President, on behalf of MUFG Union Bank, N.A., as trustee.  The Global Notes, referred to in the Indenture, evidence the obligations of PDVSA, as issuer, and PDVSA Petróleo, as guarantor, to Cede & Co., which is the registered holder of the 2020 Notes.

## E.     FALSE AND MISLEADING STATEMENTS AND OMISSIONS CONCERNING THE VALIDITY OF THE 2020 NOTES.

45.     Defendants repeatedly made false and misleading statements and omissions concerning the validity of the 2020 Notes.  These statements and omissions were made prior to the Exchange Offer, at the time of the Exchange Offer (including in the governing documents executed in connection with the Exchange Offer), and for multiple years after the 2020 Notes were issued leading up to the filing of the Declaratory Judgment Action.

a.      **False and Misleading Statements and Omissions in the Offering Circular**

46.     In the Offering Circular, PDVSA stated that "[t]he purpose of the Exchange Offer [was] to extend the maturities of and refinance the Existing Notes" and "to rearrange [its] debt profile."  (Ex. 1 at 7.)  This statement was false, as Defendants' purpose in conducting the Exchange Offer was, in fact, to defraud bondholders by inducing them to tender in the Exchange Offer and/or purchase the 2020 Notes on the primary or secondary market, and then refusing to fulfill their repayment obligations under the 2020 Notes.

47.     The Offering Circular contained a 15-page discussion of "Risk Factors," including discussion of risks including decreases in oil and gas prices; social and political tension in Venezuela; the Venezuelan government's control over PDVSA's domestic prices; the Venezuelan Constitution's requirement that Venezuela retain ownership over PDVSA; the Venezuelan government's requirement that PDVSA contribute to Venezuela's social programs; and Venezuelan regulations of industry, foreign exchange and capital controls, tax laws, price controls, and the environmental law.  The Offering Circular did not, however, identify as a risk factor that the 2020 Notes, the Indenture, or the Pledge Agreement were subject to challenge as invalid or illegal, nor that those documents were subject to challenge because those documents, or the transactions contemplated by those documents, were subject to the approval of, but not approved by, the National Assembly or were in violation of the Venezuelan Constitution.  The Offering Circular also omitted the material fact that Defendants believed the 2020 Notes, the Indenture, and the Pledge Agreement were invalid, illegal, and unenforceable due to lack of approval by the National Assembly.

48.     The Offering Circular stated that the transaction and transaction documents would be governed by New York law.  PDVSA did not disclose that it believed the Exchange Offer and

11

the Governing Documents were in fact governed by Venezuelan law notwithstanding the New York choice-of-law provision.

49.     Plaintiff reasonably relied on the materially misleading statements and omissions in the Offering Circular and did rely on those statements in deciding to participate in the 2016 Exchange Offer and/or purchase the 2020 Notes in the primary or secondary market.

b.     **False and Misleading Statements and Omissions in the Indenture**

50.     In the Indenture, PDVSA and PDVSA Petróleo each represented that the 2020 Notes and the Indenture were duly authorized.  Specifically, PDVSA represented that it had "duly authorized the exchange of [2017] Notes for [2020] Notes," and "duly authorized the execution and delivery of this Indenture."  (Ex. 2 at 1.)  PDVSA Petróleo represented that it had "duly authorized the execution and delivery of this Indenture as guarantor of the [2020] Notes."  (*Id.*) The Indenture did not disclose that PDVSA and PDVSA Petróleo believed the transactions required approval by the National Assembly in order to be duly authorized.

51.     In the Indenture, PDVSA and PDVSA Petróleo also represented that the 2020 Notes and the Indenture were valid.  Specifically, PDVSA represented in the Indenture that "all things necessary to make this Indenture a valid agreement" of PDVSA had "been done" and that PDVSA had "done all things necessary to make the [2020] Notes" its "valid obligations."  PDVSA Petróleo represented in the Indenture that "all things necessary to make this Indenture a valid agreement" of PDVSA Petróleo had "been done."  (*Id.*)  The Indenture did not disclose that PDVSA and PDVSA Petróleo believed approval by the National Assembly was required under the Venezuelan Constitution to make the 2020 Notes valid obligations of PDVSA and PDVSA Petróleo.

52.     The Indenture contains a broad provision that "all matters arising out of or relating in any way whatsoever" to the Indenture are governed by New York law.  (*Id.* at 10, 68)  PDVSA

12

and PDVSA Petróleo did not disclose that they believed the Indenture was in fact governed by Venezuelan law notwithstanding the New York choice-of-law provision.

        c.     **False and Misleading Statements and Omissions in the Pledge Agreement**

53.     In the Pledge Agreement, PDVH represented to the Collateral Agent on behalf of the Secured Parties that PDVH had "full power and authority, and all governmental licenses, authorizations, consents and approvals, to execute and deliver" the Pledge Agreement "and to perform its obligations thereunder." (Ex. 3 at 9.) PDVH also represented that the "execution and delivery by [PDVH] of the [Pledge Agreement] . . . and its performance thereunder" had "been duly authorized by all necessary action by [PDVH]"; "require[d] no additional action by or in respect of, or filing with, any governmental authority, except such as have been taken or made on or before the date hereof and remain in full force and effect;" and that it would "not contravene any Applicable Law," which was defined to include Venezuelan law. (*Id.* at 9-10.) PDVH did not disclose that it believed it lacked full power and authority, and all governmental licenses, authorizations, consents and approvals, to execute and deliver the Pledge Agreement and to perform its obligations thereunder. PDVH also did not disclose that it believed the execution and delivery of the Pledge Agreement, and the performance thereunder by PDVH, required additional action in the form of approval by the National Assembly in order for the Pledge Agreement to become duly authorized. Finally, PDVH did not disclose that it believed the execution and delivery of the Pledge Agreement, and the performance thereunder, would contravene Venezuelan law absent approval by the National Assembly.

54.     PDVH also represented that the Pledge Agreement had "been duly executed and delivered by it and constitutes its legal, valid and binding obligation enforceable against it in

accordance with its terms."  PDVH did not disclose that it believed the Pledge Agreement was invalid, illegal, not binding, and unenforceable due to lack of approval by the National Assembly.

55.     PDVH also represented in the Pledge Agreement that "the choice of the laws of the State of New York as the governing law of this Agreement, the Indenture (and any Transaction Document) is a valid choice of law under the laws of Venezuela and any political subdivision thereof, and none of the Issuer, the Guarantor or the Pledgor knows of any reason why the courts of Venezuela would not give effect to such choice of law."  Finally, PDVH did not disclose that they believed the Pledge Agreement was governed by the laws of Venezuela, rather than the laws of the State of New York, or that they believed the Pledge Agreement's choice of New York law was not a valid choice of law under the laws of Venezuela.

### d.     False and Misleading Statements and Omissions in Officer, Incumbency, and Secretary Certificates for the Exchange Offer

56.     On October 28, 2016, PDVSA Director Ana María España executed an Officer's Certificate on behalf of PDVSA and PDVSA Petróleo certifying that:

- she "kn[e]w of no facts, circumstances or events that are contrary to or inconsistent with any of the statements or opinions contained in the [Hogan Lovells] Opinions";[4]

- the "representations, warranties, certifications and statements of fact of the Transaction Parties contained in or made pursuant to the Transaction Documents are true and correct in all respects"; and,

- the "execution, delivery and performance" of the Indenture and Pledge Agreement for the 2020 Notes were "within the corporate powers of such Transaction Party and have been

---

[4] *See infra* ¶¶ 66-68.

duly authorized" and did "not violate the Organizational Documents of such Transaction Party."

57.     Also on October 28, 2016, PDVH Director Jesús Luongo executed an Officer's Certificate on behalf of PDVSA and PDVSA Petróleo certifying that:

- he "kn[e]w of no facts, circumstances or events that are contrary to or inconsistent with any of the statements or opinions contained in the [Hogan Lovells] Opinions";

- the "representations, warranties, certifications and statements of fact of the [Transaction Parties] contained in or made pursuant to the Transaction Documents are true and correct in all respects"; and

- the "execution, delivery and performance" of the Global Notes, Indenture, and Pledge Agreement were "within the corporate powers of [such Transaction Party] and have been duly authorized" and did "not violate the Organizational Documents of such Transaction Party."

58.     Also on October 28, 2016, Edoardo Orsoni, PDVSA's General Counsel, executed an Incumbency Certificate for PDVSA, certifying that:

> [PDVSA Director España, PDVSA Petróleo Financial Planning Executive Director Renny Bolívar, and PDVSA Executive Director of Treasury Waldemar Negrín] are the duly elected or appointed, qualified and acting officer, director or agent of the Company who holds the office or position set forth such individual's name, authorized to sign (i) the Indenture, dated October 28, 2016 . . . (ii) the Notes, (iii) the CITGO Holding Share Pledge Agreement, and (iv) any other certificate or document to be delivered by the Company in connection" with the 2016 Exchange Offer.

59.     PDVSA did not disclose that it believed it lacked capacity to enter into the Indenture, 2020 Notes, or Pledge Agreement absent National Assembly approval, and thus España, Bolivar, and Negrín were not in fact duly authorized to sign the Indenture, Notes, or Pledge Agreement.

60.     Also on October 28, 2016, Orsoni executed an Incumbency Certificate for PDVSA Petróleo, certifying that:

> [España, Bolivar, and Negrín] are the duly elected or appointed, qualified and acting officer, director or agent of the Guarantor who holds the office or position set forth opposite such individual's name, authorized to sign (i) the Indenture, dated October 27, 2016 . . . (ii) the CITGO Holding Share Pledge Agreement . . . and (iii) any other certificate or document to be delivered by the Guarantor in connection" with the Exchange Offer.

61.     PDVSA Petróleo did not disclose that it believed it lacked capacity to enter into the Indenture, 2020 Notes, or Pledge Agreement absent National Assembly approval, or that España, Bolivar, and Negrín were not in fact duly authorized to sign the Indenture or Pledge Agreement.

62.     On the day of closing of the Exchange Offer, PDVSA's Corporate Secretary Humberto Perniciaro, as PDVSA's "duly elected and Qualified Secretary," executed a Secretary's Certificate that "in such capacity and on behalf of [PDVSA]":

- It had provided "true, correct and complete" copies of PDVSA's Articles of Incorporation and Bylaws, the resolutions adopted by the Shareholder's Meeting and the PDVSA Board;

- the board resolutions were "duly adopted" and are "in full force and effect;

- each authorized signatory of [PDVSA] "was duly elected or appointed, qualified and acting as such officer, director or authorized signatory at the respective times of the signing and delivery thereof," and affirmed the authenticity of their signatures; and

- the Secretary's Certificate was approved by an officer and director of the Issuer.

63.     PDVSA did not disclose that it believed the approving resolutions were not in fact duly adopted, due to lack of approval by the National Assembly.

   e. **False and Misleading Statements and Omissions to Analysts and Advisors Concerning the Exchange Offer**

64.     In connection with the Exchange Offer, National Assembly Opposition representatives reassured analysts at Torino Capital LLC ("Torino Capital") that they would not question the legality of the Exchange Offer, and that they agreed with the interpretation of law that

the 2016 Exchange Offer was legal and did not require the approval of the National Assembly approval.   Opposition representatives further stated to Torino Capital that they believed the September 27, 2016 National Assembly Resolution had no binding force.

65.     These statements were communicated to investors by Torino Capital, including in reports to noteholders recommending that they participate in the Exchange Offer.

66.     On September 21, 2016, PDVSA's legal counsel Hogan Lovells S.C. sent a legal memorandum to PDVSA opining that "[c]onclusively, the Exchange Offer, including the Pledge [of 50.1% of the capital stock of CITGO Holding Inc.], is not subject to the approval of the National Assembly as provided by article 150 of the Venezuelan Constitution."

67.     In September and October 2016, PDVSA's legal advisors at Hogan Lovells S.C and Hogan Lovells US LLP (together with Hogan Lovells S.C., "Hogan Lovells") provided opinion letters in connection with the Exchange Offer to various parties including PDVSA's financial advisors and the Trustee and the Collateral Agent for the 2020 Notes.   These opinion letters opined without relevant qualification that the 2020 Notes, the Indenture, and the Pledge Agreement were legal, valid, and binding, and that the execution of these documents by Defendants was duly authorized.   None of these opinion letters concluded that the Governing Documents, the choice-of-law clauses, the 2020 Notes, or the Pledge Agreement were unenforceable or invalid, nor did they conclude that approval by Venezuela's National Assembly was required for the these documents to be legal, valid, or enforceable, or that any of PDVSA, PDVSA Petróleo, or PDVH lacked the capacity to enter into the 2020 Notes, the Indenture, or the Pledge Agreement.   To the contrary, Hogan Lovells represented that the Exchange Offer, the issuance of the 2020 Notes, the execution, delivery, and performance of the 2020 Notes, Indenture, and Pledge Agreement "do[] not: (i) violate Venezuelan Law or the Articles of Incorporation and

By-Laws of [PDVSA and PDVSA Petróleo], respectively, [or] (ii) conflict with or violate any Venezuelan law, rule, regulation, order, judgment or decree applicable to [PDVSA and PDVSA Petróleo] by which any property or asset of [PDVSA, PDVSA Petróleo] or any of their subsidiaries is or may be bound."

68.     Defendants caused the legal opinions from Hogan Lovells to be delivered despite holding the belief that the 2020 Notes, the Indenture, and the Pledge Agreement were illegal, invalid, unenforceable, and not binding.

**F.     POLITICAL DEVELOPMENTS IN VENEZUELA BETWEEN THE 2016 EXCHANGE AND PDVSA'S 2019 DEFAULT ON THE 2020 NOTES**

69.     In 2018, Nicólas Maduro won reelection as President of Venezuela. The United States and certain other countries did not recognize the legitimacy of the 2018 election.

70.     On May 21, 2018, President Trump issued E.O. 13835 prohibiting "the sale, transfer, assignment, or pledging as collateral" of any equity interest in any entity 50% or more owned by the Government of Venezuela, defined to include PDVSA.  On July 19, 2018, OFAC issued GL5 as a carve-out to E.O. 13835. GL5 authorized "all transactions related to, the provision of financing for, and other dealings in the [2020 Notes] that would otherwise be prohibited by [E.O. 13835]."

71.     On January 23, 2019, President Trump recognized Opposition member Juan Guaidó as the Interim President of Venezuela.

72.     On October 24, 2019, OFAC issued General License 5A, which amended GL5 to move its effective date to January 22, 2020.  On information and belief, representatives of PDVSA were engaged in discussions with OFAC about General License 5A before it was issued.

**G.     DEFENDANTS' FRAUDULENT SCHEME CONTINUES AFTER THE 2016 EXCHANGE OFFER**

   a.     **PDVSA Makes Payments on the 2020 Notes Through April 2019, While Planning Litigation to Repudiate the Notes**

73.     Between October 2016 and April 2019, Defendants accepted the benefit of the Exchange Offer – the surrender of the exchanged 2017 Notes – and performed their obligations thereunder by making principal payments on the 2020 Notes on October 27, 2017 and October 27, 2018, for a total of $1.684 billion paid in principal, and interest payments on the 2020 Notes on April 27, 2017, October 27, 2017, April 27, 2018, October 27, 2018, and April 27, 2019, for a total of $573,240,000 paid in interest.  The National Assembly made no objection to any of these principal and interest payments.

74.     The payment of the interest due in April 2019 was approved by PDVSA's Ad Hoc Board of Directors (the "PDVSA Ad Hoc Board"), which was appointed by the Guaidó administration.  The April 2019 interest payment was also approved by the National Assembly's Permanent Commission of Finance and Economic Development, and then by the full National Assembly.

75.     At the time it approved the April 2019 interest payment, the PDVSA Ad Hoc Board believed that the 2020 Notes were not valid or enforceable, but the Board chose not to challenge the 2020 Notes as such because the PDVSA Parties were not ready to test their theory of invalidity in court and believed doing so would put the collateral underlying the 2020 Notes at risk.  By approving the April 2019 interest payment, the PDVSA Ad Hoc Board led bondholders to believe that it intended to honor its obligations under the 2020 Notes, while in private it was developing a legal strategy for challenging the validity of the 2020 Notes.

76.     For example, a PDVSA Director wrote to all members of the PDVSA Ad Hoc Board on April 15, 2019:  "[a]fter reading all the documents, I think that there is nothing else we

can do but prepare to pay the interest, in the case that illegality can be demonstrated I do not think we would have the time and we would risk the shares of Citgo that have been compromised in this procedure."

77.    Also on April 15, 2019, José Ignacio Hernández, the Guaidó administration's Special Attorney General, who was the architect of PDVSA's legal strategy, sent Interim President Guaidó a memorandum recommending payment of the interest due and payable on the 2020 Notes on April 27, 2019.  In the memorandum, Hernández stated that he had explored several options to avoid making the April payment, including "a rapprochement with holders," "considering that the failure to pay responds to a force majeure," working with the U.S. Treasury, and requesting the U.S. to issue an executive order.  The final strategy outlined in the memorandum was to argue that the Exchange Offer was illegal because the National Assembly was not allowed to investigate PDVSA's payment capacity, because the 50.1% pledge of PDVH's interest in Citgo Holding as collateral was a pledge of public assets subject to "special controls," and because the pledge was a contract of national public interest that had not been approved by the National Assembly, in violation of Article 150 of the Venezuelan Constitution.  The memorandum outlined various legal challenges to this theory, including the necessity to determine whether a violation of Venezuelan Law would be relevant to the contracts that were governed by New York law.  Subsequently, Hernández remained at the forefront of the scheme to deceive investors and deprive them of the payments that they were contractually entitled to receive.  For example, a May 6, 2023 statement by the National Assembly explained that Hernández had "proposed a strategy of action in the courts of the United States of America that privileged judicial activism over the possibilities of negotiation with the creditors of the Venezuelan State."  It is not an exaggeration to say that Hernández is at the heart of the fraud that is central to this case, and his shifting and inconsistent

explanations are telling indicia of the lies that PDVSA has continued to spew to avoid paying investors.

78.     On or around April 27, 2019, José Guerra, one of the National Assembly deputies who authored the non-binding September 2016 National Assembly Resolution questioning the decision to enter into the Exchange Offer (*see supra* ¶ 17), tweeted that "PDVSA does not require authorization from the [National Assembly] to issue debt."

79.     On May 7, 2019, Hernández published a release in Venezuelan newspaper *La Patilla* about the April 2019 interest payment, stating that "[t]he payment of interest on the PDVSA 2020 Bond is, under current conditions, the only option that protects the assets of the Venezuelan State and places the Government in a better position for the strategy of renegotiating the public debt."  This release also stated that "the Bond issue contract is still valid and binding in accordance with New York Law, which is the applicable Law," despite Mr. Hernández stating in his April 15, 2019 memorandum to Interim President Guaidó that PDVSA could seek to challenge the validity of the 2020 Notes notwithstanding the choice of New York law.

80.     On May 15, 2019, the PDVSA Ad Hoc Board published a press release announcing that it had made the April 2019 interest payment, stating that the payment was "absolutely necessary as part of the strategy to control and protect PDVSA's assets abroad" and "an important piece in the strategy for safeguarding the assets of CITGO."  This press release did not disclose that the PDVSA Parties were developing legal strategies to repudiate the 2020 Notes.

81.     Later in 2019, a former member of the Presidential Advisory Commission for the Renegotiation of the Venezuelan Public Debt published the following statement on Twitter: "[w]hy did we pay the interest of the PDVSA 2020 in April and now we argue illegality of the

bond?  In April we paid under protest to avoid having CITGO taken away from us because we were not prepared to go to trial."

82.      In a leaked audio recording from June 3, 2020, Hernández told opposition members of the National Assembly that he "directed a strategy" regarding the PDVSA Parties' legal disputes in "direct" collaboration with World Bank President David Malpass, who was Undersecretary of the Treasury for International Affairs in the Trump administration from September 25, 2017 through April 9, 2019.  That strategy involved buying time for the PDVSA Parties to initiate litigation.

b.      **After the April 2019 Interest Payment, the PDVSA Parties Accelerate Their Plans to Repudiate the 2020 Notes**

83.      On information and belief, the Guaidó Administration and the National Assembly attempted to change Venezuelan law to perpetuate their fraud over the course of 2019 and in anticipation of bringing litigation to invalidate the 2020 Notes.  On May 15, 2019, Hernández stated in an interview that "the capacity of PDVSA to enter into an agreement is ruled by Venezuelan law," and that under such law, PDVSA lacked capacity to enter the Exchange Offer. October 15, 2019, the National Assembly passed a non-binding resolution declaring for the first time that the 2020 Notes were invalid under the Venezuelan Constitution.

84.      Prior to the April 2019 interest payment, the PDVSA Parties were engaged in discussions with the U.S. Treasury Department to obtain action which would prevent foreclosure on the collateral underlying the 2020 Notes.

85.      On October 24, 2019, shortly before the Declaratory Judgment Action was filed, the PDVSA Parties secured an order from OFAC which temporarily delayed noteholders' authorization to foreclose until January 22, 2020.  The PDVSA Parties continued to engage in

discussions with the U.S. Treasury Department and OFAC to delay noteholders' authorization to foreclose on the collateral underlying the 2020 Notes.

       c.       **PDVSA Defaults on the 2020 Notes**

86.     On October 28, 2019, PDVSA failed to make a payment of $841,882,250 of principal due under the 2020 Notes.  This nonpayment of principal was an Event of Default under the Indenture.

87.     On the same day, PDVSA also failed to pay $71,559,991.25 of interest that was due under the 2020 Notes.  This nonpayment of interest became another Event of Default under the Indenture, as of November 27, 2019, when it continued for a period of 30 days.

88.     PDVSA triggered further Events of Default by alleging in their lawsuit that the 2020 Notes, the Indenture, and the Pledge Agreement "are invalid, illegal, null and void *ab initio*."

89.     On December 18, 2019, holders of at least 25% in principal amount of outstanding 2020 Notes sent an acceleration notice to PDVSA and the Trustee pursuant to Section 5.01(b) of the Indenture, specifying these Events of Default.

       d.       **The PDVSA Parties Initiate Litigation Seeking to Invalidate the 2020 Notes**

90.     On October 29, 2019, PDVSA, PDVSA Petróleo, and PDVH initiated the Declaratory Judgment Action in the United States District Court for the Southern District of New York against the Trustee and Collateral Agent to invalidate the 2020 Notes.  *See Petróleos de Venezuela, S.A., et al. v. MUFG Union Bank, N.A., et al.*, Case No. 1:19-cv-10023 (S.D.N.Y. 2019).

91.     In their Complaint, the PDVSA Parties sought a declaratory judgment declaring the 2020 Notes illegal and void because the 2020 Notes were issued without authorization of Venezuela's "National Assembly" – in other words, because the 2020 Notes were issued without

congressional approval.  The PDVSA Parties sought to invalidate the 2020 Notes under the theory that, under the Constitution of the Bolivarian Republic of Venezuela (the "Republic"), National Assembly approval was required in order to bind Venezuela to "contracts of national interest," a specific type of contract that generally involves the Republic as a party, in addition to other factors prescribed by Venezuelan law that are not met here.  That term is not formally defined in the Venezuelan Constitution, and therefore, whether an agreement is a contract of national interest (and therefore required National Assembly approval) is a question of Venezuelan law that is governed by Venezuelan court precedent.  *See id*, ECF No. 1 (Oct. 29, 2019).  That question can nonetheless be answered by this Court.

92.     The Trustee and Collateral Agent argued that the 2020 Notes are valid and enforceable because (i) the 2020 Notes are governed by New York law, and therefore the Venezuelan Constitution and the concept of "contracts of national interest" requiring National Assembly approval do not apply; and (ii) even if the contracts were in any way governed by Venezuelan law, the 2020 Notes are not "contracts of national interest" such that they required National Assembly approval.   Accordingly, the Trustee and Collateral Agent brought counterclaims against the PDVSA Parties for breach of contract, declaratory judgment, unjust enrichment, and *quantum meruit*.  *See id.*, ECF No. 40 (Dec. 18, 2019).

93.     On June 10, 2020, the parties moved for summary judgment on a subset of these claims, including the Venezuelan law issues.  Venezuelan law issues were fully briefed in front of this Court.  All parties to the litigation were permitted to take fact and expert discovery and present expert witnesses as to Venezuelan law issues for the Court's review.

94.     On October 16, 2020, the Court issued an Opinion and Order granting the Trustee's and Collateral Agent's motion for summary judgment on the grounds that New York law applied

to the 2020 Notes, and under New York law, the 2020 Notes were valid and enforceable. The Court did not rule on issues of Venezuelan law. *See id.*, ECF No. 215 (Oct. 16, 2020). As such, the questions of Venezuelan law remain the subject of a live dispute between the parties and are ripe for judicial determination in this matter.

94.     The October 16, 2020 Order was appealed to the Second Circuit, including on the grounds that Venezuelan law governs the validity of the 2020 Notes. The case remains on appeal. *See* Case Nos. 20-3858, 20-4127 (2d Cir. 2020).

95.     On October 13, 2022, the Second Circuit certified questions of law to the New York Court of Appeals. *See* Case No. 20-3858, Dkt. No. 325 (2d Cir. Oct. 13, 2022).

f.     **The PDVSA Parties' Attempt to Block the Foreclosure Sale of Citgo Lays Bare Their Continued Scheme**

96.     The PDVSA Parties have pursued their scheme to deprive bondholders from receiving the benefit of the Exchange Offer and/or payment for the 2020 Notes through litigation and court filings in other jurisdictions. On June 19, 2017, Crystallex International Corporation ("Crystallex") registered a foreign judgment against the Bolivarian Republic of Venezuela in the United States District Court for the District of Delaware. *Crystallex International Corp. v. Bolivarian Rep. of Venezuela*, Case No. 1:17-MC-00151-LPS (D. Del.). The PDVSA Parties intervened in that action. To satisfy its judgment, Crystallex sought to execute on PDVSA's shares of PDVH common stock. Disputes regarding the procedural aspects of that sale process have been ongoing for years. *See id*., ECF No. 234 (Jan. 14, 2021).

97.     On January 14, 2021, the Delaware District Court granted Crystallex's motion for an order of sale of shares of Citgo to satisfy Crystallex's judgment despite the objections of the PDVSA Parties, and, on April 13, 2021, the Court appointed a Special Master to assist with the sale of PDVSA's shares of PDVH. *See id*., ECF No. 258 (Apr. 13, 2021). Over the course of the

next two years, the Special Master designed a sale and marketing process intended to provide the best opportunity of achieving a value-maximizing result in the best interests of all parties. Throughout the Special Master's development of the sale and marketing process, the PDVSA Parties continued to attempt to block the foreclosure process by soliciting OFAC and asserting that E.O. 13835 prohibited the transfer of shares of Citgo.

98.     On April 7, 2023, the United States Department of Justice issued a letter stating that "OFAC will not take enforcement action against individuals or entities for participating in or complying with the Prefatory Steps set out in the Sales Order, as well as those who engage in transactions that are ordinarily incident and necessary to participation in and compliance with such steps, *e.g.*, potential or actual credit counterparties." *Id.*, ECF No. 553-1 (Apr. 28, 2023).  On April 19, 2023, OFAC modified E.O. 13835 to include a provision asserting that 2020 noteholders could apply for licensing to restructure or refinance payments and that OFAC "would have a favorable licensing policy towards such an agreement."  At this point, it was definitively clear that a foreclosure sale could proceed.

99.     On April 28, 2023, the Special Master issued a Supplemental Report that ordered a launch date for the foreclosure sale of June 5, 2023, a launch date of September 5, 2023 and an illustrative sale hearing on June 1, 2024.  *Id.*, ECF No. 553-1 (Apr. 28, 2023).  The Supplemental Report also provided an overview of the historical communications between the Department of Justice and the Special Master, which explained the justification and reasoning for the Department of Justice's decision to modify E.O. 13835.

100.     On May 23, 2023, despite definitive statements that OFAC would approve the sale process, the PDVSA Parties argued that no sale should be permitted to proceed because of "uncertainty" surrounding OFAC's view of the sale process.  *Id.*, ECF No. 561 at 2 ("Venezuelan

Parties' Objections").   The PDVSA Parties also asserted that "uncertainty" as to whether New York law or Venezuela law applied to the 2020 Notes should prohibit a sale from proceeding.  *Id*. at 14.  And finally, the PDVSA Parties noted that this "Court's choice-of-law ruling was almost certainly incorrect and is likely to be reversed on appeal."  *Id.*

### CLAIMS FOR RELIEF

### Count 1

**Common Law Fraud**
**Against PDVSA, PDVSA Petróleo, and PDVH**
**Concerning the Validity of the 2020 Notes**

101.   Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

102.   This is a claim for common law fraud against Defendants PDVSA, PDVSA Petróleo, and PDVH.

103.   Defendants made false and/or misleading statements of material fact and/or omitted material facts necessary to make the statements made not misleading with respect to the Exchange Offer and the 2020 Notes, as set forth above.

104.   Defendants made the false and misleading statements and omissions (i) prior to the Exchange Offer, (ii) on or about the dates the Indenture and Pledge Agreement were distributed to Plaintiff, (iii) for multiple years after the 2020 Notes were issued, leading up to Defendants' 2019 lawsuit seeking to invalidate the 2020 Notes.

105.   Such statements and the reasons why they are false and misleading are set forth with particularity above.

106.   Defendants knew or recklessly disregarded the false and misleading nature of its representations and omissions.  The bases for Defendants' knowledge or reckless disregard are set forth with particularity above.

107.    Defendants made the materially misleading statements and omissions for the purpose of inducing bondholders to participate in the Exchange Offer, and/or inducing bondholders to purchase the 2020 Notes on the primary or secondary market.

108.    Defendants' fraudulent scheme was continuous and ongoing through October 2019, when PDVSA initiated its lawsuit to invalidate the 2020 Notes.  In the years following the issuance of the 2020 Notes, Defendants continued to conceal the falsity of their statements and omissions regarding the validity of the 2020 by continuing to make payments to holders of the 2020 Notes, despite the fact that Defendants believed the 2020 Notes to be invalid at the time they were issued. Defendants also continued to solicit OFAC and challenge the validity of a foreclosure sale of the collateral underlying the 2020 Notes despite having no legal basis to do so in order to prevent the 2020 noteholders from receiving the benefit of the 2020 Notes.  This conduct was made in furtherance of the same ongoing fraudulent scheme that began with the issuance of the 2020 Notes and has continued until at least May 23, 2023.

109.    Plaintiff reasonably relied on the materially misleading statements and omissions by Defendants and their representatives, and those statements published in the 2020 Notes, the Indenture, and the Pledge Agreement, and did rely on those statements in deciding to participate in the 2016 Exchange Offer and/or purchase the 2020 Notes in the primary or secondary market. Defendants' conduct led Plaintiff to believe that Defendants would abide by the terms of the 2020 Notes, and thereby lulled Plaintiff into not bringing a cause of action sooner, including by continuing to make payments to holders of the 2020 Notes through April 2019 despite Defendants' belief the 2020 Notes to be invalid at the time they were issued.

110.    By reason of the foregoing, Defendants have committed common law fraud.

111.    As a result of Defendants' false and/or misleading statements and/or omissions of materials facts, Plaintiff has suffered damages in the amount of the purchase price for their 2020 Notes, plus prejudgment interest.

## COUNT 2

### Violations of Securities Act Section 17(a)
### Against PDVSA, PDVSA Petróleo, and PDVH

112.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

113.    Defendants' fraudulent scheme was continuous and ongoing through October 2019, when PDVSA initiated its lawsuit to invalidate the 2020 Notes.  In the years following the issuance of the 2020 Notes, Defendants continued to conceal the falsity of their statements and omissions regarding the validity of the 2020 by continuing to make payments to holders of the 2020 Notes, despite the fact that Defendants believed the 2020 Notes to be invalid at the time they were issued. Defendants also continued to solicit OFAC and challenge the validity of a foreclosure sale of the collateral underlying the 2020 Notes despite having no legal basis to do so in order to prevent the 2020 noteholders from receiving the benefit of the 2020 Notes.

114.    Defendants performed this conduct in furtherance of the same ongoing fraudulent scheme that began with the issuance of the 2020 Notes and has continued until at least May 23, 2023.

115.    Defendants were reckless, or at least negligent, in initiating their lawsuit to invalidate the 2020 Notes.  Defendants were also reckless, or at least negligent, in continuing to solicit OFAC and challenging the validity of a foreclosure sale.

116.    As a result of Defendants' fraudulent scheme, Plaintiff has suffered damages in the amount of the purchase price for their 2020 Notes, plus prejudgment interest.

117.     Defendants' fraudulent scheme is still ongoing as evidenced by frivolous legal arguments made in furtherance of this scheme as recently as May 23, 2023.

118.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated Securities Act Section 17(a) (15 U.S.C. § 77q(a)).

## **COUNT 3**

### **Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder Against PDVSA, PDVSA Petróleo, and PDVH**

119.     Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

120.     Defendants' fraudulent scheme was continuous and ongoing through October 2019, when PDVSA initiated its lawsuit to invalidate the 2020 Notes.  In the years following the issuance of the 2020 Notes, Defendants continued to conceal the falsity of their statements and omissions regarding the validity of the 2020 by continuing to make payments to holders of the 2020 Notes, despite the fact that Defendants believed the 2020 Notes to be invalid at the time they were issued. Defendants also continued to solicit OFAC and challenge the validity of a foreclosure sale of the collateral underlying the 2020 Notes despite having no legal basis to do so in order to prevent the 2020 noteholders from receiving the benefit of the 2020 Notes.

121.     Defendants performed this conduct in furtherance of the same ongoing fraudulent scheme that began with the issuance of the 2020 Notes and has continued until at least May 23, 2023.

122.     Defendants were at least reckless in initiating its lawsuit to invalidate the 2020 Notes.  Defendants were also at least reckless in continuing to solicit OFAC and challenging the validity of a foreclosure sale.

123.     As a result of Defendants' fraudulent scheme, Plaintiff has suffered damages in the amount of the purchase price for their 2020 Notes, plus prejudgment interest.

124.     Defendants' fraudulent scheme is still ongoing as evidenced by frivolous legal arguments made in furtherance of this scheme as recently as May 23, 2023.

125.     By reason of the foregoing, Defendants, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) (15 U.S.C. § 78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5).

## <u>COUNT 4</u>

**Claim for Common Law Fraud**
**Against PDVSA, PDVSA Petróleo, and PDVH**
**Concerning the Invalidity of the 2020 Notes**

126.     Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

127.     This is a claim against PDVSA, PDVSA Petróleo, and PDVH for common law fraud arising from Defendants' statements in 2019 and 2020 that the 2020 Notes are invalid and unenforceable.

128.     This claim is alleged in the alternative to Count 1 to the extent such claim does not proceed.

129.     In 2019 and 2020, Defendants claimed in sworn court filings and other public documents that the 2020 Notes were never legal, valid, or enforceable obligations.   These statements were false, because the 2020 Notes are, in fact, legal, valid, and enforceable.

130.     Such statements and the reasons why they are false and misleading are set forth with particularity above.

131.    Defendants knew or recklessly disregarded the false and misleading nature of their representations and omissions.  The bases for Defendants' knowledge or reckless disregard are set forth with particularity above.

132.    As a result of Defendants' false statements concerning the purported invalidity of the 2020 Notes, many holders of the 2020 Notes (including Plaintiff) either sold their 2020 Notes or marked down the value of their 2020 Notes.  This resulted in losses for holders of the 2020 Notes.

133.    Plaintiff reasonably relied on Defendants' statements that the 2020 Notes were invalid and unenforceable when marking down the value of their 2020 Notes and realizing a loss.

134.    By reason of the foregoing, Defendants have committed common law fraud.

135.    As a result of Defendants' false and/or misleading statements and/or omissions of material facts, Plaintiff have suffered damages in the amount of the loss in trading price on the 2020 Notes.

## COUNT 5

### Claim for Aiding and Abetting Fraud
### Against PDVSA, PDVSA Petróleo, and PDVH

136.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

137.    This is a claim against PDVSA, PDVSA Petróleo, and PDVH for aiding and abetting the other defendants' violations of law alleged herein.

138.    This claim is alleged in the alternative to Counts 1, 2, 3 and 4 to the extent such claims do not proceed.

139.    Each Defendant knew of the other defendants' fraud and substantially assisted in such fraud.

140.    Plaintiff was damaged thereby.

## COUNT 6

**Claim for Declaratory Judgment**
**Against PDVSA, PDVSA Petróleo, and PDVH**

141.    Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs, as if fully set forth herein.

142.    There is an actual, justiciable controversy between Plaintiff, on the one hand, and PDVSA, PDVSA Petróleo, and PDVH, on the other, regarding whether the 2020 Notes are "contracts of national interest" that required National Assembly approval.

143.    Under Venezuelan law, the 2020 Notes are not "contracts of national interest" requiring National Assembly approval.

144.    Plaintiff is therefore entitled to a declaratory judgment finding that the 2020 Notes are not "contracts of national interest" that required National Assembly approval.

145.    Plaintiff has no adequate remedy at law.

## PRAYER FOR RELIEF

146.    WHEREFORE, Plaintiff respectfully requests relief as follows:

   **i.**    awarding compensatory damages in favor of Plaintiff against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   **ii.**    awarding Plaintiff reasonable costs and expenses incurred in this action, including attorney's fees incurred by Plaintiff in prosecuting this action;

   **iii.**    awarding rescission or a rescissory measure of damages;

   **iv.**    declaring that the 2020 Notes are not "contracts of national interest" that required National Assembly approval; and

   **v.**    awarding such additional equitable/injunctive or other relief as deemed appropriate by the Court.

## <u>DEMAND FOR JURY TRIAL</u>

147.    Plaintiff hereby demands a jury trial on all claims herein.


Dated: June 29, 2023
New York, New York

**CLARK SMITH VILLAZOR LLP**

By:      /s/ Christopher J. Clark

Christopher J. Clark
Benjamin A. Butzin-Dozier
250 West 55th Street, 30th Floor
New York, NY 10019
Tel: (212) 582-4400
E-mail: clark@csvllp.com
E-mail: benjamin.dozier@csvllp.com

*Attorneys for Plaintiff VR Global
Partners, L.P.*

34